PHILIP E. COLLINS v. FARMERS INSURANCE EXCHANGE.

135 N. W. (2d) 503.

May 21, 1965—No. 39,485.

*Plunkett Law Office* and *Richard H. Plunkett,* for appellant.
*John M. Smith,* for respondent.

ROGOSHESKE, JUSTICE.

Appeal by defendant from a denial of its alternative motion for judgment notwithstanding the verdict or a new trial.

Plaintiff brought an action against defendant in September 1962 for the recovery of medical and hospital expenses alleged to have resulted from an accident which occurred when he was driving an automobile owned by his wife. He claimed under the medical-pay provisions of an

automobile liability policy issued by defendant to his wife. The portion of the policy which fixes coverage provides that defendant agrees—

"To pay all reasonable expenses actually incurred for necessary medical, surgical, * * * hospital * * * services * * *;

"To or for the named insured or a relative who sustains bodily injury, caused by accident, while occupying or through being struck by an automobile."

An accident is defined as "an undesigned, sudden and unexpected event." The policy limit is $5,000.

Viewing the evidence most favorably to sustain the verdict for plaintiff, these facts were established. On the night of January 4, 1960, plaintiff, having met his sales supervisor, a Mr. Scarborough, in a hotel in Faribault, Minnesota, was asked by Scarborough to drive him to his home in the same city. Snow or freezing rain was falling and the streets were slippery. Plaintiff, relatively unfamiliar with Faribault, was being directed by Scarborough. As they approached an intersection, Scarborough unexpectedly told plaintiff to turn left. Plaintiff turned too quickly for his speed, skidded, and crashed into a utility pole.

Implicit in the jury's verdict is a finding that as a result either of his car's going out of control or of its collision with the pole plaintiff suffered a subarachnoid hemorrhage. It was determined during subsequent treatment at the Mayo Clinic that the hemorrhage was due to a ruptured aneurysm. There was expert medical testimony to support the jury's finding that the rupture was caused either by excitement when the car skidded or by the jolt of the crash against the pole.

Plaintiff's medical and hospital bills exceeded the $5,000 limit of the policy. However, after defendant denied liability, it was stipulated that plaintiff, with his counsel's assistance, negotiated compromise settlements of these expenses, reducing the total to $2,250, which was paid to various claimants. Plaintiff nevertheless claimed that his full expenses were in the words of the contract "actually incurred" and he ought to recover the full $5,000. The trial court so held.

On this appeal, defendant separates its numerous assignments of error into three categories: Lack of jurisdiction; errors of law occurring at trial; and misconduct of plaintiff's counsel.

■ Plaintiff commenced this action on September 27, 1962, by serving summons and complaint on Clayton Wanous, identified as the district manager or district agent of defendant at Owatonna. Defendant complains, first, that service on its agent was a breach of the insurance contract because of the provision that "[s]ervice of process * * * against the Exchange shall be upon the Farmers Underwriters Association, Atty. in fact," and Wanous was not an agent of Underwriters Association. This argument is facile; although the California Exchange may appoint a domestic attorney in fact to accept service for it within California, that appointment is additional to, not destructive of, the means of service provided for by Minnesota law within this state.[1] Whether or not proper service was accomplished, then, depends upon the requirements of our law.

Service of summons upon foreign corporations is governed by Rule 4.03(c), Rules of Civil Procedure, which provides in part:

"Service of summons within the state shall be made as follows:

* * * * *

"Upon a domestic or foreign corporation, by delivering a copy to an officer or managing agent, or to any other agent authorized expressly or impliedly or designated by statute to receive service of summons, and if the agent is one authorized or designated under statute to receive service any statutory provision for the manner of such service shall be complied with."

Under this rule, it is clear that service may be made by delivering a copy of the summons and complaint to either (1) "an officer," (2) a "managing agent," (3) "any other agent authorized expressly or impliedly" to receive service, or (4) any agent "designated by statute to receive service." In the case of foreign insurance companies, Minn. St. 543.08 designates the insurance commissioner to receive service and to forward the summons, this provision of the statute being one of the portions not superseded by Rule 4.03(c).[2]

---

[1] State ex rel. Hilton v. LeRoy Sargent & Co. Inc. 145 Minn. 448, 177 N. W. 633.

[2] Appendix B(1), Rules of Civil Procedure; see, 1 Youngquist & Blacik, Minnesota Rules Practice, p. 61.

Defendant argues that service upon the insurance commissioner is the only, or at least the favored, means of service on a foreign insurance company. But there is nothing in the rule that leads one to that conclusion, and that construction would overturn law that has been settled for almost as long as there has been more than one means of service upon insurance companies.[3] Rule 4.03(c) clearly makes equally acceptable four alternative persons to whom a summons can be delivered in order to effectuate service.

The issue then is whether Clayton Wanous was an agent authorized to receive service. By his own testimony, he was at least impliedly authorized to do so since he admitted that he did so in the normal course of business and that he believed he accepted and forwarded plaintiff's summons and complaint to defendant's home office. Their receipt is not disputed. We have no difficulty in agreeing with the trial court that the insurer intended that receipt of service be within Wanous' authority because it was "directly connected with and essential to the business expressly entrusted to the agent,"[4] even though not expressly stated.

■ Defendant assigns four errors of law occurring at trial. The first concerns the trial court's instruction to the jury that plaintiff could recover if his hemorrhage occurred any time after his car went out of control. Since the evidence concerning the sequence of hemorrhage, loss of control, and collision was in dispute, a finding of liability or no liability turned on the instruction. According to the trial court's memorandum accompanying its denial of defendant's post-trial motions, the court proposed in chambers the instruction ultimately given and both parties acquiesced. In giving the instruction, the court made liability turn on whether the aneurysm ruptured before or after "the car went out of control and hit the telephone pole." After plaintiff pointed out that the jury might take the court's language to mean that in order to find for plaintiff they must find that the rupture occurred after *both* loss of control and collision, the court clarified its instruction so that the

---

[3]Baldinger v. Rockford Ins. Co. 80 Minn. 147, 82 N. W. 1083.

[4]Derrick v. The Drolson Co. Inc. 244 Minn. 144, 152, 69 N. W. (2d) 124, 130.

jury understood that they might find for plaintiff if the rupture occurred after *either* loss of control or collision. It was not until after this clarification that defendant objected.

The legal issue raised was, and is, rather simple. It is whether loss of control of the car so that it went into a skid could constitute an "accident" within the meaning of the policy. If so, then the court's instruction would be correct. To state the policy's definition of accident, "an undesigned, sudden and unexpected event," is to resolve the issue in favor of the plaintiff. The breadth of the policy definition clearly includes an unexpected skid, and a ruptured aneurysm caused by shock reaction to the skid is therefore a bodily injury[5] caused by an accident.

■ The second error of law asserted by defendant is that the trial court failed to limit plaintiff's recovery to the amount he actually paid to doctors and hospitals under the terms of a settlement, $2,250, rather than the amount of medical and hospital bills limited by the policy, $5,000. Whether or not the trial court was correct depends on an interpretation of what is intended by the policy language "expenses actually incurred." The definition of incur is "to become liable for," as distinguished from actually "pay for." This definition has been well fixed and delineated in the case law, and we are compelled to conclude that the insurer, when it used that language, intended to bind itself to pay the amount the insured became liable for, not the amount he paid as a result of a collateral transaction.[6]

We think that this construction based on the literal meaning of the insurer's language is also the more reasonable interpretation. Plaintiff found himself forced to settle his liabilities for less than their full

---

[5]Defendant also contends that an injury, in order to be "bodily injury" under the policy, must be caused by trauma, and that therefore plaintiff could recover only if his hemorrhage was caused by his head striking the steering wheel upon collision. This reading of "bodily injury" is far too narrow for the policy defines bodily injury to mean "bodily injury, sickness or disease, including death at any time resulting therefrom."

[6]See, United States v. St. Paul Mercury Ind. Co. (8 Cir.) 238 F. (2d) 594; Maryland Cas. Co. v. Thomas (Tex. Civ. App.) 289 S. W. (2d) 652; Bartlett v. Vanover, 260 Ky. 839, 86 S. W. (2d) 1020.

amount at least partially because defendant denied his claim. It would be wrong to permit defendant to gain by its denial of a meritorious claim, or to encourage it to deny claims in the hope that a claimant will settle his liabilities. Furthermore, our interpretation is consistent with the rule of damages in either tort or contract that permits recovery even though plaintiff may have been compensated for his loss by a third party.[7]

■ Defendant's third assignment raises possibly the most troublesome question in this case. It claims that the trial court should have dismissed plaintiff's case with prejudice because plaintiff had not complied with policy provisions requiring him to authorize defendant to obtain medical reports. The contract provides:

"As soon as practicable the injured person or someone on his behalf shall give to the Exchange written proof of claim, under oath if required, and shall, after each request from the Exchange, execute authorization to enable the Exchange to obtain medical reports and copies of records."

It is undisputed that plaintiff furnished authorizations prior to trial to allow inspection of the records of the Mayo Clinic, St. Mary's Hospital, and Dr. Robert Meyer, who attended him immediately after the accident. Plaintiff sought to recover for expenses incurred at those hospitals and for a drug bill at his home pharmacy. Plaintiff did not seek recovery for charges made by Deaconess Hospital, Faribault, where he was treated immediately after the accident; Dr. Meyer; Dr. Olson, his private physician; nor Dr. Virgil Richard Zarling, who examined him preparatory to testifying as an expert for him.

Except as to Dr. Meyer, no prior authorizations were given for records held by the hospital and doctors whose expenses plaintiff did not seek to recover. No request therefor was made until counsel for defendant verbally made a request of plaintiff's counsel on January 10, 1964, followed by a request by letter dated January 13, seven days

---

[7] See, Dyson v. Schmidt, 260 Minn. 129, 109 N. W. (2d) 262; Dahlin v. Kron, 232 Minn. 312, 45 N. W. (2d) 833.

before trial. The letter enclosed four identical printed forms entitled "AUTHORIZATION FOR RELEASE OF MEDICAL INFORMATION,"[8] which plaintiff was requested to sign. By letter, plaintiff's counsel advised that he refused to have plaintiff sign the forms because they contained a clause revoking all authorizations previously given to anyone and were not specifically limited to the injury for which he was claiming nor to the records of the hospitals and pharmacy whose charges he was seeking to recover. Plaintiff's counsel insisted that the policy gave defendant no right to require such an authorization. In response, defendant's counsel modified the forms by striking out the revocation clause and returned them to plaintiff's counsel, who received them on January 17, a Friday. Since the trial was to begin the following Monday, and plaintiff's counsel could not in the ordinary course of the mails obtain plaintiff's signature and return them before trial, as he explained to the court, he simply retained them. The record also reveals that during trial defendant made an effort to obtain the records of Deaconess Hospital but then discovered that those records were on file with the Industrial Commission in St. Paul. At no time during trial did plaintiff assert any medical privilege, and defendant made no further effort to examine the records of Deaconess Hospital or the pharmacy. Plaintiff called Dr. Zarling, and his records were made available to defendant. Dr. Olson was not called by either party.

On January 21, the second day of trial, defendant moved for a dismissal of plaintiff's action on the ground that plaintiff had breached the insurance contract by refusing to sign the authorizations. The court denied the motion, and in its memorandum following judgment in the case reasoned in effect that plaintiff had substantially complied with the contract provision. However, the court also indicated that "after

---

[8]"I hereby waive as to PLUNKETT LAW OFFICE, 210 Northwestern Bank Building, Rochester, Minnesota, all provision of the law prohibiting any physician or surgeon who has attended me from disclosing any information thereby acquired for the purpose of diagnosis and treatment, and do hereby authorize and direct —————————, AND any physician or surgeon to give to the person or company designated any information which they may have acquired attending me in a professional capacity.

"I hereby revoke all former authorizations given by me."

the defendant has failed to live up to its contractual obligations * * * plaintiff thereafter would not be obliged to comply with the contract." In our opinion, this latter reason alone would not support the court's ruling.

The quoted provision of the insurance contract creates a contractual duty upon the insured or one claiming thereunder to provide a waiver of the medical privilege for all records relating to his bodily injury. Under the express provisions of the policy, "[n]o action shall lie * * * unless * * * all the terms" of the policy are complied with. This is a condition precedent to suit, and a claimed breach thereof, under Rules 8.03 and 9.03, Rules of Civil Procedure, would be an affirmative defense. Where such a defense is not pleaded in the answer, under Rule 12.08 it is waived. The defendant's answer does not assert this defense, and the court might have based its refusal to dismiss on the ground of waiver. However, defendant's failure to plead this defense would not justify plaintiff's refusal to comply with the contractual duty during trial, and if such refusal resulted in prejudice to defendant, a new trial would be required. Neither would defendant's refusal to admit liability after a claim was made or action commenced be a ground upon which plaintiff could refuse to waive privilege. The purpose of the contractual waiver is to permit the insurance company to investigate the claim in order to determine whether to admit or deny liability. If defendant could claim privilege upon a denial of liability, it would frustrate the very purpose of the provision. Hence, one of the reasons the court assigned for holding against defendant was erroneous.

There is no doubt that the contract provisions required plaintiff to supply authorizations to examine all medical records relating to his injury, whether recovery was sought for the services rendered or not, and even though the insurance company contests the claim. This duty, however, is conditioned upon a proper request by defendant.

The court found that there was substantial compliance, and we believe that under the circumstances disclosed such is established and defendant suffered no prejudice. Although suit was commenced in September 1962, defendant waited until 7 days before trial in January 1964 before requesting these authorizations. The requests made cer-

tainly were not in proper form. Although we cannot condone plaintiff's unwillingness to authorize disclosure of all medical reports and records, we can understand his counsel's failure to do so within the time that was available before trial. During trial, plaintiff did not deny defendant access to any information sought, and defendant's failure to make further effort to secure the Deaconess Hospital records from the Industrial Commission suggests that the purpose of its motion may have been as much to delay trial as it was to secure a dismissal or a disclosure of the medical records. We hold that the court did not err in denying defendant's motion to dismiss.

■ Defendant's fourth and last assignment is that the trial court erred by not continuing the trial from the January 20, 1964, date so that defendant could take the deposition of a Dr. Cohen, then residing in London, England. The motion was made on January 10, 1964, just 3 days before trial was set; after it was denied, trial was postponed to January 20. This case, however, was originally placed on the October 1962 calendar, carried over to the May 1963 calendar, then to the November 1963 calendar, apparently by consent of counsel. We cannot say, considering the amount of time defendant had available to take the deposition, that the trial court abused its discretion by not allowing defendant additional time for that purpose.[9] The trial court was especially secure in its position because its denial was not prejudicial, since Dr. Cohen's superior, Dr. Rushton, testified.

■ Defendant's concluding argument is that the misconduct of plaintiff's counsel denied it a fair trial. This is a matter within the discretion of the trial court.[10] After a review of the whole record, we think not only that the trial court was within its discretion in denying a mistrial, but we are not persuaded that plaintiff's counsel was guilty of any prejudicial misconduct.

Affirmed.

---

[9]Rule 40, Rules of Civil Procedure.

[10]E. g., Wilson v. Sorge, 256 Minn. 125, 97 N. W. (2d) 477; Olson v. Prayfrock, 254 Minn. 42, 94 N. W. (2d) 540.